**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**AMANDA ANN LAFFERTY,**

      **Plaintiff,**

**vs.**                               **CIVIL ACTION NO. 2:17-CV-02201**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATION</u>**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security dying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered April 4, 2017 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court is Plaintiff's Memorandum in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 18 and 19.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (Document No. 18.), **GRANT** Defendant's request to affirm the decision of the Commissioner (Document No. 19.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

**Procedural History**

The Plaintiff, Amanda Ann Lafferty (hereinafter referred to as "Claimant"), protectively filed her applications for Title II benefits and for Title XVI benefits on August 15, 2012, alleging disability beginning December 31, 2008[1] due to "depression, high blood pressure, back problems, arthritis in knees, heart issues, borderline diabetic, weight problems, sleep apnea, and irritable bowel syndrome".[2] (Tr. at 275.) Her claims were initially denied on February 5, 2013 (Tr. at 123-127, 128-132.) and again upon reconsideration on April 4, 2013. (Tr. at 135-137, 138-140.) Thereafter, Claimant filed a written request for hearing on April 12, 2013. (Tr. at 141-142.)

An administrative hearing was held on October 8, 2014 before the Honorable Harry C. Taylor, II, Administrative Law Judge ("ALJ"). (Tr. at 60-72.) Afterwards, the case was reassigned, and a supplemental hearing was held on February 26, 2015 before ALJ John T. Molleur. (Tr. at 30-59.) On July 29, 2015, the ALJ entered a decision finding Claimant was not disabled. (Tr. at 7-29.) On September 11, 2015, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 6, 403-405.) The ALJ's decision became the final decision of the Commissioner on February 2, 2017 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-5.) On April 3, 2017, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) In response, the

---

[1] At the first administrative hearing in this matter, held before Administrative Law Judge Harry C. Taylor, II on October 8, 2014, Claimant agreed to amend her alleged onset date of disability to November 13, 2012, based on the opinion testimony provided by Medical Expert, Judith Brendemuehl, M.D. (Tr. at 68-69.)

[2] In her Disability Report dated August 25, 2012, Claimant alleged that she stopped working on March 19, 2004 "[b]ecause of other reasons" – that she "started school", however, she asserted that her disability began December 31, 2008, her date last insured ("DLI"). (Tr. at 271, 275.) In a subsequent Disability Report – Appeal, submitted on February 7, 2013, Claimant alleged that she had been diagnosed with fibromyalgia, with carpal tunnel syndrome in both hands and had a release in her right hand, with fatty liver disease, disc deterioration in her back and three torn discs; she also alleged having extreme mood swings. (Tr. at 308.) She also alleged she was in constant pain and her conditions had grown worse. (Id.)

Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 10 and 11.) Subsequently, Claimant filed a Memorandum in Support of Judgment on the Pleadings (Document No. 18.), in response, the Commissioner filed a Brief in Support of Defendant's Decision (Document No. 19.), to which Claimant filed her Reply. (Document No. 20.) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 33 years old as of the amended alleged onset date, and is defined as a "younger person" throughout these proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 21.) Claimant graduated from high school and attended college for five or six years, and was a few credits short of obtaining her Bachelor's Degree. (Tr. at 21, 70-71.) Claimant last worked in March 2004 as a video rental clerk, however, she was employed for about eleven months by the West Virginia Department of Health and Human Resource as an office assistant II, and last worked on August 7, 2014. (Tr. at 38, 44, 50, 276.) Ultimately, Claimant was let go from the State job because she missed too much work due to her back pain. (Tr. at 38-39.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the

sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

(c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2008. (Tr. at 13, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since November 13, 2012, the amended alleged onset date. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe

---

disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

impairments: obesity; carpal tunnel syndrome; degenerative disc disease of the lumbar spine; and fibromyalgia. (<u>Id.</u>, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 15, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform sedentary work

> except she could never climb ropes or ladders, and could only occasionally perform stooping, kneeling, bending, crouching and crawling. She reported she could frequently perform fingering and handling with the bilateral hands, but could never work around unprotected heights.

(Tr. at 16, Finding No. 5.)

At step four, the ALJ found that Claimant was incapable of performing past relevant work. (Tr. at 21, Finding No. 6.) The ALJ then determined that based on Claimant's age, education, ability to communicate in English, and the immateriality of transferability of Claimant's job skills, that the RFC supported a finding that there are other jobs in the national economy that Claimant can perform. (<u>Id.</u>, Finding Nos. 7-10.) Ultimately, the ALJ determined that Claimant had not been under a disability from November 13, 2012 through the date of the decision. (Tr. at 22, Finding No. 11.)

**<u>Claimant's Challenges to the Commissioner's Decision</u>**

Claimant asserts two main grounds of error in support of her appeal.

The first is that the ALJ failed to follow the Regulations in evaluating medical expert Dr. Judith Brendemuehl's opinion provided at the October 8, 2014 hearing. (Document No. 18 at 9-10, 13.) Claimant points out that the ALJ inexplicably gave more credit to State agency medical consultants' opinions that predated Dr. Brendemuehl's testimony by two years, but he adopted Dr. Brendemuehl's opinion that Claimant's onset date was November 13, 2012. (<u>Id</u>. at 11.) Further,

7

the ALJ did not provide any rational explanation for rejecting Dr. Brendemuehl's opinion, and failed to abide by the Agency's own rule with respect to fibromyalgia, which is not necessarily demonstrative by objective medical evidence, but by other evidence in the record, namely, Dr. Brendemuehl's testimony. (Id. at 11-12.)

The ALJ indicated that his credibility analysis of Claimant's allegations also subtracted from the weight to be given to Dr. Brendemuehl's opinion, which is an impermissible method of evaluating opinion evidence. (Id. at 12.) The ALJ's rejection of Dr. Brendemuehl's opinion is not harmless because the vocational expert testified that an individual limited to the extent Dr. Brendemuehl found would not be able to sustain employment. (Id.) Moreover, the ALJ rejected this opinion without citing to any contrary evidence in the record, ostensibly replacing the medical expert's opinion with his own lay opinion. (Id. at 13.)

The second alleged ground of error is that the ALJ did not properly consider and weigh the opinion provided by Claimant's treating physician, Jason Barton, D.O. (Id. at 13-15.) The ALJ gave Dr. Barton's opinion no weight, did not cite any contrary persuasive evidence as his explanation, but instead provided speculation for the doctor's opinion. (Id. at 15.) This speculation was not even supported by the Agency's own medical expert, Dr. Brendemuehl. (Id. at 15-16.)

Claimant asks the Court to reverse and remand the final decision for an award of benefits or for a correction of the errors made below. (Id. at 16.)

In response, the Commissioner points out that Claimant worked and attended school throughout most of the relevant period she claimed to be disabled. (Document No. 19 at 9, 10.) Additionally, the November 13, 2012 onset date was an amendment voluntarily made by Claimant with advice of her then and current counsel. (Id.) The Commissioner also states that Claimant, by

counsel, sought to further amend her alleged onset date to August 2014 during the supplemental administrative hearing, however, the record became confused and therefore the ALJ considered the entire relevant period, from November 13, 2012 forward. (Id. at fn.5.) Claimant testified that the only reason she took the job at the DHHR was because she needed the money, and the record shows she exceeded substantial gainful activity levels. (Id. at 10.)

Next, the Commissioner contends that the ALJ appropriately discounted Dr. Brendemuehl's opinion, as she did not examine Claimant, but rendered her opinion based on the medical records of evidence then available. (Id. at 11.) Further, the ALJ noted Dr. Brendemuehl did not have the benefit of reviewing other medical records and that some reports that predated her testimony had not yet been submitted. (Id. at 12.) For instance, records submitted after Dr. Brendemuehl's testimony demonstrated Claimant significantly improved with physical therapy. (Id.) The ALJ also discounted Dr. Brendemuehl's testimony because the objective evidence, that included Claimant's work history and school attendance, as well as Claimant's doctors' excuses from work or school averaging a day or less for absences. (Id. at 12-13.) The supplemental hearing following Dr. Brendemuehl's testimony concerned evidence of Claimant's nearly two years of work and/or schooling which did not reconcile with Claimant's assertions of severe pain precluding all work. (Id. at 13.) Other objective medical evidence of record also deviated from Dr. Brendemuehl's testimony, that Claimant's physical examinations were relatively unremarkable. (Id.)

Contrary to Claimant's assertion otherwise, the Commissioner argues that the ALJ did give some credence to Dr. Brendemuehl's testimony concerning Claimant's subjective pain complaints, and limited her to the sedentary work level; especially when the evidence showed that Claimant

was performing sedentary work during the period she claimed disability. (Id. at 14.) Though other opinion evidence from State agency medical consultants opined Claimant was capable of light work, the ALJ gave her the benefit of the doubt and found she was more limited, just not disabled. (Id.)

Furthermore, the ALJ abided by Social Security Ruling 12-2p by examining all evidence in the record with respect to Claimant's fibromyalgia; again, Claimant was working at a sedentary level, evidence that demonstrated she remained capable of other work. (Id. at 15.) This evidence further undercut Dr. Brendemuehl's testimony, and the ALJ had discretion to adopt the medical expert's statement or not, but properly declined to do so in accordance with the Regulations. (Id.)

With regard to Dr. Barton's opinion, the Commissioner argues that the ALJ complied with the Regulations and was justified in not fully crediting the doctor's extreme statements concerning his patient's disability, which were not only unsupported by other evidence, but also his own contemporaneous treatment notes. (Id. at 16-17.) The ALJ noted that Dr. Barton did not provide any medical evidence to support his opinion. (Id. at 17.) The Commissioner points out that Dr. Barton issued Claimant's medical excuses for one day or less which belie his opinion that Claimant was not even capable of sitting, walking or standing more than two days total during a course of a workday, and further demonstrated that Claimant was capable of more activity than she alleged. (Id. at 17-18.)

Dr. Barton's office records and his disability statement were in stark contrast to each other, and the ALJ provided the necessary narrative that will allow the Court to discern why he discounted Dr. Barton's opinion. (Id. at 18.) Finally, the evidence was overwhelming that Claimant was not disabled, and indeed, the evidence showed that Claimant's symptoms improved

significantly in September 2014, but no evidence indicated that her condition declined precipitously from then to the date of the decision in July 2015. (<u>Id</u>. at 19.)

The Commissioner asks the Court to affirm the final decision, as it is supported by substantial, if not overwhelming evidence. (<u>Id</u>.)

In reply, Claimant asserts that her State-sponsored work program does not constitute substantial evidence with respect to the ALJ's discounting of Drs. Brendemuehl's and Barton's opinions. (Document No. 20 at 1.) The ALJ already determined that Claimant had no substantial gainful activity since November 12, 2013. (<u>Id</u>. at 2.)There is no dispute that Claimant missed on average two days per month when she worked for the DHHR which the vocational expert testified would preclude substantial gainful activity. (<u>Id</u>. The fact that Claimant did attempt to gain more skills and to obtain employment actually enhances her credibility. (<u>Id</u>.)

Claimant reasserts that the ALJ did not comply with Agency rules and relied upon the lack of objective evidence to discount Claimant's subjective complaints, particularly with respect to her severe impairment of fibromyalgia. (<u>Id</u>. at 3.) Claimant argues that the Commissioner's footnote argument[4] that an adjudicator can express the sentiment that a treating physician may have pro-patient bias has been rejected by the Fourth Circuit. (<u>Id</u>. at 3-4.) Without any reference to probative evidence to support such sentiment, the ALJ's inference of pro-patient bias is not supported by substantial evidence, especially when he gives more credit to the opinions of two no-

---

[4] The authority for this position comes from <u>Dixon v. Massanari</u>, 270 F.3d 1171, 1176 (7th Cir. 2001), however, this was argument was rejected by another court in this circuit in <u>Kratzer v. Astrue</u>, 2008 WL 936753, at *10 (W.D. Va. April 8, 2008). The undersigned reviewed both cases, and notes that <u>Kratzer</u> court appropriately found that the ALJ's inference of pro-patient bias was not supported by substantial evidence because the Fourth Circuit does not endorse such a practice, but also, and of great importance in this case, the ALJ therein failed to cite "any probative evidence in the record to support an inference of pro-patient bias", failed to consider "all of the available evidence", and "totally ignore[d] compelling medical information from multiple treating sources." <u>Id</u>. at *9-10. For reasons stated *infra*, that case is distinguishable from the one at bar.

treating, non-examining State agency reviewers. (Id. at 4.) The ALJ was still required to provide an explanation for the weight he gives a treating source opinion, and further, was required to provide persuasive contrary evidence, not just the absence of objective evidence to discredit Claimant's allegations of pain. (Id. at 5.)

Claimant renews her request for remand. (Id.)

**The Relevant Evidence of Record**[5]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Carpal Tunnel Syndrome:

A treatment note dated October 10, 2012 indicated that Claimant had a long history of right carpal tunnel syndrome, finally necessitating in a surgical release. (Tr. at 680.) At a two-week follow up, she reported a 75-100% improvement with the surgery. (Tr. at 682.)

Neck pain:

After her successful right carpal tunnel release surgery in October 2012, Claimant complained of neck that PARS medical providers believed was likely a manifestation of cervical spondylosis with stenosis. (Tr. at 685.) An MRI of the cervical spine showed a "mild" reversal of cervical lordosis and was otherwise a "normal study." (Tr. at 687.) Claimant's treating specialist saw "no cervical pathology to account for her symptoms" and therefore had "nothing to offer her surgically." (Tr. at 690.)

Knee pain:

In February 2013, Claimant fell and reported knee pain. (Tr. at 826.) An MRI of the

---

[5] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

left knee showed only "mild" edema with possible cartilaginous contusion or a "mild" chondromalacia patella and was otherwise grossly unremarkable. (Tr. at 820.)

Shoulder pain:

Due to complaints of left shoulder pain, in May 2013, an MRI confirmed Claimant suffered a partial rotator cuff tear. (Tr. at 812, 830.) In addition to an injection (Tr. at 830.), specialists at PARS recommended physical therapy; by August 2013, treatment notes indicated that Claimant's "shoulder overall [was] feeling better." (Tr. at 841, 842.) Claimant was subsequently discharged from therapy due to failure to return for her scheduled appointments. (Tr. at 843.)

Lumbar pain:

Due to complaints of ongoing back pain, treatment records indicate that Claimant underwent a bilateral T11-12, L1-2 injections on March 18, 2013 (Tr. at 793-794.) and April 30, 2013 (Tr. at 801.) at the PARS Pain Center. Claimant experienced a brief reduction in her pain, but about a month after receiving injections, she reported her pain returned as before. (Tr. at 797, 809.) During physical examinations, she exhibited normal gait and able to stand without difficulty. (Tr. at 799, 811.) On June 25, 2013, an MRI of her lumbar spine indicated mild degenerative changes in her lower spine without significant canal stenosis and mild left foraminal stenosis at the lumbosacral unction, otherwise, an unremarkable finding. (Tr. at 823-824.)

In August 2013, during physical therapy for her shoulder, Claimant continued to complain of pain in the lumbar spine that she rated at the level of "30!" out of 10. (Tr. at 840.) The assessment indicated that she was limited by back pain and that Claimant could not have physical therapy "because she can't stand for anybody to touch her back and can't do aquatic

therapy because she can't get in and out of the pool." (Id.) It was noted that Claimant was "[p]leasant and talkative throughout session and not appear to be in distress, although appeared uncomfortable with pulleys and wand [exercises], but from back, not shoulder." (Id.)

On August 15, 2013, Claimant presented to her primary care physician, Dr. Barton, as "cooperative and in acute distress (tearful)" and exhibited "tenderness over bilateral lumbar paraspinal musculature"; she reported that conservative measures for treating her pain offered no relief. (Tr. at 886-887.) She had normal gait and station. (Tr. at 887.) In September 2013, Dr. Barton referred Claimant to WVU Healthcare pain clinic. (Tr. at 918.) However, the pain clinic physicians declined to see her for an initial consultation after review of the records, explaining that they did "not feel that we have anything additional to offer to this patient's care." (Tr. at 917.)

During a return visit on January 21, 2014, Claimant reported that her back pain was "severe and worsening" and that despite continuing to receive injections at PARS Pain Center, the last time she went "nearly killed her." (Tr. at 876.) She stated that her symptoms were exacerbated by standing, sitting, lifting, bending and twisting, and nonsteroidal anti-inflammatory drugs and opioid analgesics provide relief. (Id.) She admitted she could perform her activities of daily living with limitations. (Id.)

On July 30, 2014, Dr. Barton referred Claimant to Timothy R. Deer, M.D. for her neck and mid to low back pain. (Tr. at 962-967.) Claimant was "very tearful during the whole interview" and reported having this pain for years and that it had increased over the last one to two years, and that it radiates into her shoulders and both hips; she reported numbness in her right leg. (Tr. at 962-963, 966.) It was noted that the fentanyl patch, Norco, and steroid injections

provided no relief (Id.), however ice provided "excellent relief" for the short term. (Tr. at 964.) A physical examination indicated that Claimant had full range of motion in both shoulders, tenderness on palpation with hypersensitivity and muscle spasms in the lumbosacral spine, and negative straight-leg raising test. (Tr. at 965.) She was positive for numbness in her right leg, an antalgic gait was observed, as well as abnormal bilateral knee and ankle reflexes. (Tr. at 966.) Dr. Deer recommended 12 weeks of physical therapy. (Tr. at 967.)

By September 17, 2014, Claimant remarked that she was "feeling better" and could not "believe how much a difference therapy has made in just a few treatments." (Tr. at 1078.) At her next session the next day, despite a stiff neck, she had no back pain at all post-therapy. (Tr. at 1079.) She reported, later that month, that she had "walked a lot this weekend" and that her pain was reduced, which was "awesome." (Tr. at 1080.) With pool therapy on October 2, 2014, Claimant reported that her pain "went completely away shortly after entering the water." (Tr. at 1089.) On October 7, 2014, Claimant reported being in a great deal of pain, a 9/10 on the pain scale, but thought the weather may have impacted it; she performed all her exercises in the water without complaint, and indicated she had relief with the aquatic exercises. (Tr. at 1090.) For the remainder of her physical therapy sessions, Claimant presented with greater pain levels of 6-10/10, but reported that her pain went away when in the water, at one point reporting that diminished her pain to the level of a "1" out of 10, "that was exactly what I needed." (Tr. at 1093.)

A repeat MRI ordered in January 2015 was "fairly unremarkable" and showed only "very mild" degenerative changes. (Tr. at 1123, 1126.)

Treating Source Medical Opinion:

On September 5, 2014, Dr. Barton completed a physical Medical Assessment of Ability

to Do Work Related Activities on Claimant's behalf. (Tr. at 1069-1072.) Dr. Barton opined that she could lift/carry a maximum of ten pounds occasionally and frequently in an 8-hour workday; that she could stand/walk for one hour total in an 8-hour workday, and for ten minutes without interruption. (Tr. at 1069.) Dr. Barton also opined that Claimant could sit for one hour total, and fifteen minutes without interruption in an 8-hour workday. (Tr. at 1070.) Claimant could never climb, balance, stoop, crouch, kneel, or crawl, but she had no environmental restrictions, except that she must avoid heights. (Id.) Dr. Barton further stated that due to Claimant's severe lumbar pain and dysfunction, "she cannot reliably do activities beyond short periods of walking, sitting, and standing." (Tr. at 1071.) Finally, Dr. Barton opined that Claimant's impairment limited her to frequent reaching in all directions, including overhead. (Id.)

**The Administrative Hearings**

Judith Brendemuehl, Medical Expert ("ME") Testimony:

Dr. Brendemuehl testified that Claimant had received a series of three knee injections in 2010 and that her physician believed her knee pain was related to her morbid obesity. (Tr. at 64.) She stated that the radiological evidence of the knees from 2010 appeared to be normal, but Claimant may have had a cartilaginous contusion or chondromalacia patella according to a 2013 MRI. (Id.) She indicated a 2012 MRI of the lumbar spine revealed mild degenerative changes with some facet hypertrophy resulting in at least mild left granular stenosis or impingement. (Tr. at 65.) Dr. Brendemuehl stated the record showed consistent complaints of wide-spread pain and documented 16 of 18 pressure points for a positive diagnosis of fibromyalgia, and confirmed that the medications and trigger-point injections offered to Claimant were appropriate for the treatment of fibromyalgia and that the proper testing to exclude other diseases and disorders was performed.

16

(Tr. at 65-66.) Dr. Brendemuehl further emphasized frequent pain scale reports of ten out of ten, with the least amount of pain reports as six to eight out of ten. (Tr. at 65.)

Dr. Brendemuehl outlined Claimant's obstructive sleep apnea diagnosis and highlighted the sleep study that confirmed Claimant does not have REM sleep; the doctor explained that REM is the restorative part of our sleep pattern, and that without this part of the sleep cycle, a person would experience exhaustion. (Tr. at 66.) Dr. Brendemuehl further explained, "non-restorative sleep in the face of fibromyalgia is an issue." (Id.) Additionally, Dr. Brendemuehl stated there was a period of time when the fibromyalgia symptoms prevented Claimant from performing normal activities, and as a result, she became deconditioned despite engaging in physical and aqua therapy. (Tr. at 67.)

Dr. Brendemuehl stated that Claimant's BMI in the 60 range also made it "much more difficult for her to function." (Id.) Because the symptoms and documentation of fibromyalgia did not date back to Claimant 2008 DLI, Dr. Brendemuehl opined her onset date of disability to be November 13, 2012 because of the documentation of the tender points. (Id.) Because pain levels were recorded at ten out of ten as of July 2014, Dr. Brendemuehl opined that it would interfere with persistence and pace, concentration, and the ability to complete tasks. (Tr. at 67-68.) Dr. Brendemuehl stated Claimant would need frequent breaks, and that because of her deconditioning, also would be unable to sustain an eight-hour workday. (Tr. at 68.)

<u>Claimant Testimony:</u>

During the first administrative hearing on October 8, 2014, Claimant testified that she was 35 years old, weighed 350 pounds, and was 5'6". (Tr. at 69.) She stated she had last worked in 2004, and her previous work included a job in a retail warehouse and as a pharmacy associate. (Tr.

17

at 71.) Claimant confirmed that she was willing to amend her onset date to November 13, 2012. (Tr. at 71-72.)

During the supplemental administrate hearing on February 26, 2015, Claimant testified that she could not work because it hurt to walk and sit. (Tr. at 38.) She described crushing pain in her back and leg numbness when she walked. (Tr. at 40.) She stated she last worked as an office assistant for the Department of Health and Human Resources. (Tr. at 38.) She stated she sat at the computer inputting information and answering the phone. (Id.) She was not required to carry anything heavier than papers and was not permitted to lift anything weighing more than a gallon of milk. (Tr. at 40-41.) Claimant explained that her husband did not consistently pay child support and that she took the position because she did not have any money. (Tr. at 38.) She indicated she obtained the job through a special program that paid approximately $300 per month for a little over a year while she obtained computer certifications. (Tr. at 41.) She confirmed that she had missed classes during her training program in order to receive and recover from spinal injections. (Tr. at 48.)

Claimant described difficulties with sustaining work due to pain in her hands and lower back. (Tr. at 46.) She stated that her carpal tunnel pain required her to stop, stretch, shake, and rub her hands and that her lower back pain caused her to need to lean over to ease pressure. (Tr. at 46-47.) She explained that her right hand no longer hurts unless she "write[s] and type[s] a lot." (Tr. at 49.) Claimant stated that walking around does not ease her fibromyalgia pain but instead causes pain. (Tr. at 47.)

Claimant testified that she had taken frequent work breaks, especially at the end of her employment, because her symptoms had become so bad. (Id.) She explained that she had

18

previously undergone surgery for her right hand and needed surgery on her left but was not ready to do it yet because "it was the worst surgery I have ever been through and I'm trying to put it off as long as possible." (Tr. at 47, 49.) She admitted to being absent from work a total of at least five weeks, or an average of two days per month, during her 11 months of employment with the state due to her back and not being able to move. (Tr. at 38-39, 41.) Claimant confirmed she was terminated from this position due to missing too much work. (Tr. at 39.) She stated her employer knew about her impairments and had been understanding. (Tr. at 47-48.)

Claimant testified that she could not sleep in a bed because she could not fully lie down. (Tr. at 41.) Instead, she slept in a recliner. (Id.) She explained that she is only comfortable when in a recliner with her feet up, and even then, her pain is not 100 percent relieved. (Tr. at 46.)

She described her duties as an office assistant to include logging in mail, answering telephones, filing, scanning, and accepting and delivering mail. (Tr. at 52.) She stated she was not on her feet for more than an hour a day, although other workers in a similar position did spend more time on their feet. (Tr. at 52-53.) She explained that she was not assigned those duties that would require standing and walking because she could not physically do them. (Tr. at 53.)

Patricia Posey, Vocational Expert ("VE") Testimony:

The VE described Claimant's past work as an office clerk (DOT NO. 209.562-010) at the light, semi-skilled (SVP 3) level. (Tr. at 51.) The VE confirmed that a similar position would not be available at the semi-skilled, sedentary level. (Tr. at 54.)

The VE testified that a hypothetical individual with Claimant's vocational profile and controlling RFC could not perform Claimant's past work but could perform other work in the national and regional economies. (Tr. at 55-56.)

19

The VE stated that an individual further limited to lifting and carrying five pounds would be precluded from all competitive employment. (Tr. at 56.) Likewise, the VE confirmed that if an individual had two to three unscheduled absences per month, she would be unable to maintain employment. (Tr. at 57.) The VE then indicated that an individual who was limited to occasional handling and fingering bilaterally would be unable to perform sedentary work. (Tr. at 58.) The VE testified that an individual who was off task more than 15 percent of the workday could not sustain employment. (Id.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). The Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

As stated previously, Claimant argues that the ALJ failed to adhere to the Regulations in evaluating the opinions provided by Dr. Brendemuehl as well as her treating physician, Dr. Barton. With respect to the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other

factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(c)(2), 416.927(c)(2).

In this case, the ALJ noted that Claimant's treating physician, Dr. Barton, completed a Medical Assessment of Claimant's Physical Ability to Perform Work-Related Activities on September 5, 2014, described in detail, *supra*. The ALJ gave this opinion "no weight" stating,

> The doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, ***as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints***. The doctor's own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled, and the doctor did not specifically address this weakness. Finally, the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where ***the opinion in question departs substantially from the rest of the evidence of record***, as in the current case. (Tr. at 20.) (emphasis added)

The "rest of the evidence of record" included the following: in the four broad functional areas, the ALJ found Claimant had mild limitations in activities of daily living, which included caring for her school-age daughter, performing household chores such as preparing meals, doing laundry, and sweeping; the ALJ found Claimant had no limitation in social functioning because she reported caring for her daughter, going out alone, shopping, getting along fine with authority figures, having attended school and spending time with her mother and neighbors; the ALJ found Claimant had mild limitations in concentration, persistence or pace because Claimant reported "she could pay attention for as long as she wants and did 'just fine' with both written and spoken

instructions, enjoyed reading, watching television, fishing and shooting guns, and "[t]hese activities require a certain amount of concentration"; and finally, the ALJ found no evidence of episodes of decompensation of extended duration. (Tr. at 14, 287-294, 323-330.)

The ALJ also considered Claimant's allegations of back pain, arthritis, fibromyalgia, carpal tunnel syndrome and obesity, and that these impairments made it difficult for her to stand or walk for longer than 20 minutes. (Tr. at 17.) Claimant's statements that she had pain in her hands, and increased pain in her knees and other joints from activities including lifting, standing, walking, reaching, sitting, kneeling and climbing were also considered. (Tr. at 17, 274-285, 295-302.) However, the ALJ found Claimant's "statements regarding her impairments imply an attempt to present herself as more limited than she is in order to secure benefits." (Tr. at 17.)

The ALJ reviewed the evidence concerning Claimant's carpal tunnel syndrome, with greater problems in her right hand than left, but following surgery in October 2012, she "identified 75 to 100 percent improvement." (Tr. at 17, 682.) The consultative examination with Stephen Nutter, M.D. in January 2013 revealed that she "had full range of motion and sensory of the bilateral hands", and "able to pick up items with either hand and write with her dominant hand", though the ALJ acknowledged she exhibited some tenderness in her right hand. (Tr. at 17, 503-508.)

With regard to Claimant's pain complaints, the ALJ did note that there were "relatively limited objective findings to support the severity of allegations", and that her severe and constant pain in her knees, back and throughout her body was the result of fibromyalgia, however, the ALJ determined "her allegations are so extreme as to appear implausible." (Tr. at 17.) The ALJ noted the "significant amount of medical records" that predated Claimant's amended alleged onset date, and that despite her reports of severe pain that was made worse with physical activity, "X-rays

showed no deformity and joint spaces were maintained. Clinically the patellar grind test was positive, but Dr. [Joseph] Darrow identified the claimant's primary issue as morbid obesity. However, she underwent Supartz injection to the left knee to help with pain relief." (Id.)

Significantly, the ALJ found Claimant's "treatment is best described through progress notes of Jason Barton, D.O.", but her "physical examinations proved generally unremarkable, with neurological findings, gait and station routinely within normal limits (Exhibit 23F)[6]." (Tr. at 18.) The ALJ considered Dr. Barton's treatment notes from July 2013 concerning Claimant's back pain, and despite no relief from injection therapy, "physical examination was normal with the exception of tenderness at the lumbar paraspinal muscles." (Id.) Dr. Barton advised weight reduction, and that bariatric surgery was likely in Claimant's future. (Id.) August 2013 treatment notes indicated that conservative therapy did not bring Claimant relief, however, she was noncompliant with diet and exercise recommendations. (Id.) It was also noted that pain specialists at University Health could offer nothing towards Claimant's care. (Id.)

The ALJ continued his discussion of Dr. Barton's treatment notes from September 2013 and November 2013 that documented Claimant's complaints of back pain, and that she requested a new pain doctor. (Tr. at 19.) However, the ALJ also noted that "[d]espite these continued complaints of significant pain, the claimant reported [s]he remained able to do activities of daily living with limitations." (Id.)

In addition to Dr. Barton's own treatment notes during the relevant period, the ALJ examined other medical evidence of record, including the January 2013 consultative examination provided by Dr. Stephen Nutter. (Tr. at 18.) The ALJ noted that Dr. Nutter's examination showed

---

[6] This Exhibit concerned the office treatment records from Mid-Ohio Valley Medical Group, dated June 14, 2013 through August 19, 2014. (Tr. at 968-1068.)

tenderness in both of Claimant's knees, and some range of motion reduction due to obesity, but she "was able to walk on heels and toes, balance, and perform tandem gait with minimal difficulty." (Id.) Dr. Nutter's report also indicated Claimant had negative straight leg raising and had only some tenderness in her hips. (Id.)

Other medical evidence the ALJ considered was from PARS neurological associates, which documented that during the summer of 2013, despite normal physical examinations, and injection therapy, providers had "nothing else to offer the claimant." (Id.)

Finally, the ALJ discussed the treatment records provided by Dr. Deer, pain specialist, who found Claimant demonstrated decreased range in motion and pain with palpation, though the recent January 2015 MRI indicated only "very mild degenerative changes" in Claimant's lumbar spine. (Tr. at 19.) Again, the ALJ noted that the "physical examinations completed by [Claimant's] primary care physicians and specialists alike proved relatively unremarkable, with exception of subjective pain complaints and a body mass index of as high as 61." (Id.)

Moreover, the ALJ examined other evidence unrelated to medical records, which included Claimant's job training through West Virginia Works in January 2013. (Tr. at 19.) The ALJ noted Dr. Paul A. Dunn's consultative psychological examination report that Claimant was "reportedly maintaining a household, caring for her daughter, and managing a job." (Id.) Additionally, the ALJ acknowledged that there were several work and school excuses throughout the treatment records that were for "one-day or less absences, and do not identify any specific limitations in activities once a return to work or school was made, but do support the fact the claimant was participating in work activity and activities of daily living generally greater than she initially alleged." (Id.)

Notably, the ALJ found that Claimant participated in schooling and/or job training that

resulted in employment with the West Virginia DHHR, which was at substantial gainful activity levels "for through at least August 2014 (Exhibit 8D)."[7] (Id.) The ALJ explicitly stated that "[a]though the claimant amended her alleged onset date[8] to after such substantial work ended, the undersigned notes that the record does not support any significant increase in pain or other symptoms following this date." (Id.) Further, the ALJ found "[t]he fact the claimant could participate in work activity through August 2014 certainly does not bolster her allegation of an inability to work thereafter." (Id.)

Overall, the ALJ provided a thorough narrative in his explanation for the "no weight" he gave Dr. Barton's opinion, and did not base his rejection solely on his "own speculation about the motives of a licensed physician" as contended by Claimant. (Document No. 18 at 15.) Further, the ALJ provided the Court with "good reasons" for not giving Dr. Barton's opinion controlling weight.

Accordingly, the undersigned **FINDS** the ALJ's evaluation of Claimant's treating physician opinion evidence is supported by substantial evidence.

As noted *supra*, 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) govern the SSA's evaluation of opinion evidence:

> Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable

---

[7] This Exhibit concerned wage information, dated June 3, 2015, submitted after the supplemental hearing. (Tr. at 266-270.) In a letter dated June 3, 2015, the West Virginia DHHR Payroll Manager reported that Claimant was employed from September 16, 2013 through November 7, 2014. (Tr. at 266.)

[8] At the supplemental hearing in February 2015, counsel for Claimant advised the ALJ that if he could not find that Claimant's employment was not a trial work period, then Claimant was willing to amend her onset date to August 7, 2014, the date she last worked. (Tr. at 43, 44.) After the hearing, Claimant's counsel submitted a post-hearing brief to the ALJ arguing that Claimant's work in 2013 and 2014 should not be considered substantial gainful activity for purposes of her disability claim, that is was accommodated work due to her impairments. (Tr. at 398-400.) The ALJ found that the amendment of onset to August 7, 2014 was not renewed in the post-hearing brief, and determined that the argument was abandoned, and proceeded to decide the case from the alleged onset date of November 13, 2012. (Tr. at 11.) Nevertheless, the ALJ determined that there was insufficient evidence that Claimant engaged in a trial work period or that her work was subsidized, "[a]s no information was submitted regarding accommodations that may have been provided by the employer", but she had been able to work for approximately a year at substantial gainful activity levels. (Tr. at 13.)

> medical sources that reflect judgments about the nature and severity of your
> impairment(s), including your symptoms, diagnosis and prognosis, what you can
> still do despite impairment(s), and your physical or mental restrictions.

The Regulations provide that an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(c)(2)-(6), *supra*. With respect to Dr. Brendemuehl's testimony, the ALJ noted the doctor's opinion that Claimant's deconditioning could result in an inability to complete an eight-hour workday, but that she "did not have the benefit of reviewing the other medical reports contained in the current record." (Tr. at 20.) Again, the ALJ expressed that "as has been discussed in detail elsewhere in this record, the subjective allegations of pain and other symptoms are simply not supported by the objective evidence of record." (Id.) As mentioned *supra*, Dr. Brendemuehl testified that Claimant's pain levels, "ten of ten as of July of '14", would also interfere with her concentration, persistence or pace. (Tr. at 68.)

However, as the ALJ "discussed in detail elsewhere in this record", Claimant's own statements in her applications for disability benefits indicated she "could pay attention for as long as she wants" and that she enjoyed reading, watching television, fishing and shooting guns.[9] (Tr. at 14.) The undersigned notes that during the initial administrative hearing, the evidence at the time did not indicate Claimant performed "no[] work whatsoever since 2004." (Tr. at 71.) Clearly, the evidence elicited during the supplemental hearing and afterwards, as described more fully, *supra*, belies Dr. Brendemuehl's opinion, as noted by the ALJ. Furthermore, though the ALJ did not specifically reference Claimant's physical therapy sessions in his decision, it is notable that after the initial hearing, those treatment records indicated she responded very well to aquatic therapy, where she reported that pain symptoms were significantly reduced. (Tr. at 29, 1089-1095.)

---

[9] The undersigned notes that Claimant alleged she did not fish and shoot guns "as much" because it hurt her hand and caused it to go numb. (Tr. at 291.)

It is important to recognize that the opinion provided by Dr. Brendemuehl pertaining to Claimant's limitations in functioning during an eight-hour workday are "residual functional capacity . . . or the application of vocational factors", which are issues solely reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Moreover, pursuant to Sections 404.1527(d)(3) and 416.1527(d)(3), the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." The evidence of record does not support Claimant's argument that the ALJ disregarded Dr. Brendemuehl's testimony and supplanted his own lay opinion as to what Claimant remained capable of performing in the same vein as Grimmett v. Heckler, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974); McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983)). (Document No. 18 at 13.) An RFC determination is based "on *all* the relevant evidence in [the] case record", which includes "relevant medical and other evidence" as well as "statements about what [the claimant] can still do", "descriptions and observations of [the claimant's] limitations . . . provided by [the claimant] . . . [.]" See 20 C.F.R. §§ 404.1545(a)(1), (a)(3), 416.945(a)(1), (a)(3) (emphasis added) The undersigned notes that a medical opinion is not necessary in formulating a claimant's RFC, however, the Regulations and controlling case law are clear that the Commissioner is obligated to consider "all" the evidence in the record. Colvard v. Chater, 59 F.3d 165 (4th Cir. 1995) ("The determination of a claimant's [RFC] lies with the ALJ, not a physician, and is based upon *all* relevant evidence.") (emphasis added)

It is also important to note that Social Security Ruling 12-2p states that "before we find that a person with a[] [medically determinable impairment] of [fibromyalgia] is disabled, we must ensure there is sufficient ***objective*** evidence to support a finding that the person's impairment(s)

so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity." 2012 WL 3104869, at *2. (emphasis added) In addition, SSR 12-2p provides that "if objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, we consider all of the evidence in the case record[.]" Id. at *5. This "evidence in the case record" includes the enumerated factors listed in §§ 404.1529, 416.929. Id.

Given the conflicting evidence consisting of Claimant's allegations of pain and other symptoms with the objective and other evidence of record, the undersigned recognizes that the ALJ is responsible for resolving the conflict, and the issue before the Court is not whether Claimant is disabled, but whether the ALJ's finding is supported by substantial evidence and was reached based upon a correct application of the relevant law. See, Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1995). In this case, the only consistent evidence of record concerns Claimant's subjective complaints of constant pain, however, these in and of themselves are not disabling impairments. See, Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986.)

The ALJ concluded that "[a]lthough the claimant suffers from physical impairments that are significantly limiting, those limitations have been adequately assessed in the residual functional capacity herein." (Tr. at 21.) Moreover, the ALJ found Claimant's limitations simply "did not preclude all work", and that "even when a more limiting [RFC] was posed to the [VE], [s]he was able to testify consistently with the DOT that significant jobs existed both in the regional and national economies." (Id.) Indeed, as the record demonstrated, Claimant worked at a level of substantial gainful activity in 2013 and 2014, the significance of this fact is glaring.

In sum, the undersigned **FINDS** the ALJ's discussion of the objective and other evidence of record in his evaluation of Dr. Brendemuehl's testimonial opinion concerning Claimant's disabling pain and other limitations complied with the pertinent Regulations as well as the Agency's Rulings. Further, in accordance with this Court's duty to scrutinize the record as a whole, the undersigned **FINDS** the Commissioner's conclusion that Claimant was not disabled was "rational" and supported by substantial evidence. Oppenheim v. Finch, 495 F.2d at 397.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's motion for judgment on the pleadings (Document No. 18.), **GRANT** the Defendant's request to affirm the decision below (Document No. 19.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: November 1, 2017.

Omar J. Aboulhosn
United States Magistrate Judge